**Marjorie E. SOUTER, Widow, Appellant,**

v.

**STATE MUTUAL LIFE ASSURANCE COMPANY, Appellee.**

**No. 7974.**

United States Court of Appeals Fourth Circuit.

Argued Nov. 19, 1959.

Decided Jan. 7, 1960.

Michael P. Crocker, Baltimore, Md. (J. Hardin Marion, III, Baltimore, Md., on the brief), for appellant.

Robert E. Coughlan, Jr., and Biscoe L. Gray, Baltimore, Md., for appellee.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOBELOFF, Chief Judge.

The ultimate question in this appeal is whether an insurance policy on the life of plaintiff's deceased husband, Robert K. Souter, ever went into force. At the conclusion of the testimony on both sides, the District Court directed a verdict in favor of the defendant insurance company, and the widow-beneficiary appeals.

On May 20, 1955, Robert K. Souter signed an application for insurance with defendant, State Mutual Life Assurance Company, Worcester, Massachusetts, and paid the first monthly premium of $11.25 to Henry H. Boyer, II, the agent. Boyer gave Souter a "conditional receipt," conditional, *inter alia*, on the applicant's being a standard risk. The next day, May 21, 1955, State Mutual's doctor gave Souter, then 39 years old, a complete medical examination, during which the doctor learned that Souter had asthma, but otherwise was apparently in good health.

State Mutual's home office, on July 7, 1955, prepared a "rated policy" at an increased premium because of the history of asthma, and sent it to the Baltimore office, which in turn referred it to agent Boyer. Boyer met with Souter about July 15 to review the policy. At this meeting, Souter declined to accept the terms of the rated policy and told Boyer that the additional premium was unfair.[1] Souter said he would seek coverage elsewhere, whereupon Boyer volunteered to assist him in this endeavor, and in fact contacted another insurance company. Souter did not at this time sign the proffered amended application for the rated policy, nor did he pay the additional premium required. Neither, however, did Boyer return the earlier prepaid "first premium." After this

---

1. Mrs. Souter testified that, "My husband said that he felt it was unfair for him to have to accept a policy with an additional premium * * * "

meeting, the Souters themselves also contacted another insurance agent.

On July 23, 1955, Souter became very ill and was operated on on August 11, 1955. In the course of the operation the doctors determined that Souter had cancer, and that his condition was hopeless.

A few days later, on August 15, Mrs. Catherine W. Amos, a friend of the Souters, learning that agent Boyer had a policy for Souter, called Boyer, had him bring the policy to her office, paid him $34.83, the balance due on the quarterly premium, and received the policy on behalf of Souter. At this time, Mrs. Amos knew that Souter was afflicted with a serious illness, one that could be fatal, and she told this to Boyer. He testified:

"* * * I told her that I did not think he could be insured. I was 99% sure that he could not be insured, since the premium had not been paid on the policy, and at this time Mr. Souter was not insurable, but I wanted Mr. Souter to have coverage if it was at all possible, and I was not going to take it on myself to make the decision. So, I stated that in order for Mr. Souter to be insured, if it was at all possible, the balance of the premium on the rated policy would have to be paid, and the amendment signed * * *"

Mr. Souter later signed the amended application, which was brought to him by Mrs. Amos, but it was rejected by the insurance company. Instead, the company sent back the premiums paid, which, in turn, Souter would not accept. When he died soon afterwards, in November, the company refused to pay the plaintiff the policy benefit and this suit was brought.

The District Court held, as a matter of law, that the policy never came into force because it was not delivered until August 15, 1955, when Mr. Souter clearly was not in sound health, and that agent Boyer had no authority to waive the sound health requirement. It relied on the following provisions in the policy application, which became a part of the policy itself:

"* * * (2) That no liability shall exist unless and until the policy hereby applied for shall be delivered and the first premium thereon paid during the lifetime and sound health of the person proposed for insurance * * *"

"* * * (4) That no agent is authorized to make, alter, or modify the terms of this application or any contract issued thereon * * *"

■ 1. Plaintiff seeks to avoid the force of paragraph (2), cited above, which requires delivery of the policy during the "sound health" of the insured, averring that there is credible evidence which would warrant a jury's finding that the policy was constructively delivered on July 15, 1955, when Mr. Souter was still apparently in good health. The plaintiff stresses (1) that Boyer neither returned nor tendered the "first premium" to Mr. Souter although State Mutual's home office had instructed him to do so if the policy was not "placed" within 10 days after the agent's first try, that is about July 15, 1955; and (2) that neither Boyer nor the home office made any effort to recover the premium receipt which they knew was still outstanding, or to cancel the policy, even as late as August 15, 1955, when Souter was a patient in the hospital and had already been operated on. From facts (1) and (2) plaintiff argues that a jury could reasonably infer that Boyer's actions of August 15, 1955, especially his delivery of the policy to Mrs. Amos, show that he considered the policy already in force.

The evidence does not, in our opinion, fairly lend itself to this interpretation nor would it warrant a jury's finding a constructive delivery on July 15, 1955. Undeniably, Souter had declined to accept the policy on that day. Boyer was not then or thereafter regarded, by himself or by Souter, as holding a delivered policy of Souter. In fact, both were exploring alternative insurance coverage. Boyer's testimony discloses that he entertained the hope that, should other coverage on the desired terms prove un-

attainable, he might later induce Souter to reconsider and accept the previously unacceptable policy.[2] He wished, in the meantime, to keep the matter in suspension. This may explain why he did not return to Souter the premium prepaid at the regular rate, or the rated policy to the company; but neither this nor any other circumstance in the case constitutes evidence of constructive delivery on July 15.

■■■ 2. It is the plaintiff's further contention that even if the policy was not constructively delivered in July, there is credible evidence that a binding contract came into effect on August 15, 1955, when the policy was actually delivered to Mrs. Amos, and that agent Boyer waived the requirement of sound health. Concededly, Boyer had no *actual authority* to waive the requirement that the insured be in sound health at the time the policy is delivered. Both State Mutual's agency contract with Boyer and the rate book or agent's manual specifically negate such authority. On the other hand, the Souters admittedly were unaware of these limitations. Plaintiff relies, in any event, upon *apparent authority* in Boyer to waive the requirement and maintains that it was waived.

This contention, based on apparent authority to waive, cannot prevail since "[t]he delivery was made by Heiniger [here Boyer], a mere soliciting agent, and there is nothing to show authority on his part to make such waiver." Massachusetts Mutual Life Ins. Co. v. National Bank of Commerce, 4 Cir., 1938, 95 F.2d 797, 800, 118 A.L.R. 1065; see also 16 Appleman, Insurance Law and Practice, §§ 9124–9125 (1948), and cases cited therein. In the Appleman treatise, a "general agent" is defined as one "invested with discretionary powers in the acceptance or rejection of risks, a person who has the authority to bind the insurer by his contracts, or to issue policies from his own office." 16 Appleman, supra, § 9124, n. 67. See also Couch on Insurance, § 506 (1929). In the instant case, Boyer does not meet this widely accepted test for a general agent, because he had no power to issue policies on his own, to accept or reject risks. On the contrary, his authority was confined to soliciting applications, collecting initial premiums, arranging for medical examinations, and delivering policies under prescribed conditions. The decision as to whether to issue a policy was made at the home office. In short, Boyer, being only a soliciting agent, had no apparent authority to waive the sound health provision.[3]

■■■ 3. Finally, plaintiff insists that even if the sound health requirement was not waived by Boyer, it is not applicable

---

2. "Q. When you last saw Mr. Souter in July, you did not return to him the premium money that he paid you in May, did you? A. No.
"Q. That money had been delivered to the Company? A. Yes.
"Q. And they continued to retain it? A. Yes, at that time I held the policy. It is the usual procedure. I hold the policy until I go into Baltimore, and give the policy back if the person does not want the policy, or, sometimes, I will hold the policy, especially if it is a rated policy, because people change their minds. For instance, Mr. Souter may have tried another company, and they may have turned him down completely, and he would have come back to me and say that he would take the policy.
"Q. Mr. Souter continued to retain that first premium receipt that you had given him, did he not? A. Yes.

"Q. He had it up until the time of his death, as far as you know? A. As far as I know.
"Q. After you last saw Mr. Souter, you did not return the policy to State Mutual for cancellation? A. No, for the reason that I just stated."

3. It should be noted that even if Boyer had apparent authority to waive the provision in question, it is extremely doubtful that it could be found that he did so when he delivered the policy to Mrs. Amos. The very declaration "I told her that I did not think he could be insured. I was 99% sure * * *" sounds like no waiver; rather, it is an avowal of lack of authority.

The plaintiff also pointed out that in Paragraph (2) of the policy above quoted, Boyer was denied authority to "make, alter, or modify" its terms, but was not expressly forbidden to "waive." This dis-

to the cancer discovered between the insurer's medical examination on May 21, and the delivery of the policy to Mrs. Amos on August 15, since the most favorable interpretation of the medical testimony would support an inference that the malignant growth had begun before the examination. There is decisional support in a number of states for the proposition that the sound health clause should not be read literally but should "be construed as safeguarding the company against only such impairment of the health of the insured as may have arisen in the interval between the time the medical examination was made and the time when the policy was issued."[4]

However, the Court of Appeals of Maryland has not decided the precise point whether the literal or the broad rule prevails in that state as to the meaning of the sound health provision.[5] Nor need we anticipate how the Maryland court would answer the question because under either rule we must reach the same conclusion in this case.

The apparent reason for the more liberal construction of the sound health clause is that an insurance company is estopped from asserting as a defense conditions which a proper medical examination would have disclosed.[6] Estoppel, however, cannot be invoked in the circumstances here present. It deserves emphasis that this is not a case of an insurance company's seeking to avail itself of the sound health clause after the insured had received the policy and reasonably relied on its protection. In Prudential Ins. Co. of America v. Kudoba, supra, the court explained its reason for following the broad rule as follows:

"* * * If an applicant for such insurance is examined by a medical representative of the company, and is 'passed,' and a policy thereupon issues, he is certainly justified in assuming, in the absence of any fraud or misrepresentation on his part, that the company has satisfied itself as to his state of health, and that he can rest confident in the belief that he has obtained a valid policy of insurance upon his life. For the company *later* to be allowed

---

tinction, even if valid, would be ineffective to aid plaintiff here, because as a soliciting agent Boyer had no more authority to waive than to make, alter, or modify.

4. Prudential Ins. Co. of America v. Kudoba, 1936, 323 Pa. 30, 34, 186 A. 793, 795. For a similar statement, see Hungate v. New York Life Ins. Co., 1932, 267 Ill. App. 257. In the Kudoba case, Justice Stern collects the authorities supporting a literal approach to the sound health clause in his note 1 and those supporting a broader rule in note 2. See also Vance, Handbook on the Law of Insurance, § 102 (3rd ed., 1951).

5. Eureka-Maryland Assur. Corp. v. Scalco, 1930, 158 Md. 73, 148 A. 267 involved a completely different factual situation. Though there was some mention of the sound health provision, the court was not called upon to construe it.

6. As stated in Roe v. National Life Ins. Ass'n, 1908, 137 Iowa 696, 699, 115 N.W. 500, 501, 17 L.R.A.,N.S., 1144,
"The deceased was examined by a physician, acting for the defendant, who recommended the risk. It is *estopped* then from setting up as a defense 'that the insured was not in the condition of health required by the policy at the time of the issuance or delivery thereof unless the report of the physician was procured by or through fraud or deceit of the assured.'" (Emphasis supplied)
Other cases, e. g., Prudential Ins. Co. of America v. Kudoba, supra, purportedly rest on the ground of waiver, rather than estoppel. We believe it more accurate, however, to regard these cases as based on estoppel. Waiver connotes the *voluntary* relinquishment of a known right, whereas estoppel is *involuntary* and is grounded upon reliance by the insured upon conduct of the insurer which the latter will not in good conscience be allowed to repudiate. Vance supra, § 81; Lee and Chapnick, "Effect of Loss Upon Waiver and Estoppel in Insurance Law," 9 Miami Law Quarterly 247 (1955). In our view, an insurer, by its medical examination, does not voluntarily consent to relinquishment of any of its known rights, although its subsequent conduct may preclude the assertion of these rights.

successfully to contend that the policy never became effective because the applicant breached the sound-health clause in that he suffered from disease or bodily impairment when the policy was delivered to him, in a case where the same condition existed when the company examined him, would be to give countenance to a practice that, while perhaps not fairly to be characterized as fraudulent, would be unreasonably destructive of the protection which life insurance is aimed to secure. It would result, as argued in appellant's brief, that 'no one would ever know if he were insured or not, even though he has passed a medical examination and *received a policy.*'" 1936, 323 Pa. 30, 35, 186 A. 793, 795. (Emphasis supplied)

No such inequitable conduct is suggested here; there was no misleading of the insured.

■ It is essential that one invoking an estoppel shall have justifiably relied, to his detriment, on the conduct of the party sought to be estopped—that is, that he changed his position for the worse. 3 Pomeroy, Equity Jurisprudence, § 805 (5th ed., 1941). In the instant case, the defendant company at no time caused Souter to change his position to his detriment. Certainly he had no justification to stop looking elsewhere for insurance after the examination by defendant's physician on May 21, 1955, nor did he. In fact, this examination lead defendant to offer Souter a rated policy in July, 1955, which he declined to accept. Thereafter, as has been noted, the Souters sought insurance on more favorable terms than those offered by defendant. When, on August 15, Boyer actually delivered the policy to Mrs. Amos, Souter had already undergone surgery for cancer and was in a hopeless condition. Again, it cannot be said that because of defendant's actions he refrained, to his detriment, from seeking other insurance after August 15, since in his desperate state he manifestly would have been unable to effect coverage anywhere. Moreover, when Souter after August 15 sent the signed application to the defendant, it did not accept the application, but, instead, sought to return the premiums already paid. Thus the indispensable element for estoppel is absent.

To summarize, we hold that there was no constructive delivery of the policy on July 15, 1955; that there was no waiver of the sound health provision on August 15, 1955, as Boyer had no authority to waive; and that the defendant insurance company is not estopped by its medical examination in May, 1955, or otherwise, from raising the sound health provision. Whether the provision be literally or broadly construed, it follows inescapably that no insurance was effected on the life of this dying man.

■ It may be added that there is nothing to show that the disease, if present, was discoverable in the examination made as early as May, 1955. The relevant medical testimony on this point follows:

"(The Court) Doctor, how far does a condition of this sort have to develop before an ordinary external examination by a trained physician would indicate the probabilities of something being wrong?

"(The Witness) Usually it is the symptom that brings the patient to the doctor, and in some of these cases you get symptoms very early, usually bleeding, not too often pain until it is fairly well advanced. Again, when we see those patients, it is purely guess work as to how long they have had it before. I don't think that one can make a definite statement, but I am quite sure there is a great deal of variation in the onset of the symptoms. I have seen patients that have had bleeding for six or eight months with no other symptoms, and then I have seen others that have had bleeding for a short time, who developed pain or some other signs much sooner than that.

"Does that give you any—

"(The Court) It depends on the location and the individual.

"(The Witness) Entirely."[7]

This testimony, as we read it, was merely to the effect that the witness did not know whether the cancer was discoverable at the time of the examination. We recognize, of course, that the mere absence of affirmative medical opinion would not preclude the jury from drawing its own inference, if there was other evidence from which it could with reason draw the suggested inference. We are mindful of the admonition in Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520,[8] and recognize that if an inference could with reason be drawn in favor of the plaintiff, the judge would not be empowered to substitute a contrary inference which he might prefer because it seems to him more reasonable. The record persuades us, however, that here the jury would have had no rational basis whatever for drawing the inference that in May the medical examiner could and therefore should have discovered the cancer. Giving unstinting application to the liberal measure of the jury's function, reaffirmed recently in Sentilles v. Inter-Caribbean Shipping Corp., 80 S. Ct. 173, we conclude that the District Judge was correct in directing a verdict for the defendant.[9]

The judgment below must be

Affirmed.

SOPER, Circuit Judge (concurring in the result).

The outstanding undisputed fact in this case is that the policy was delivered when the insured was dying of cancer, and that the parties to the transaction—Agent Boyer representing the insurance company and Mrs. Amos representing the insured—had knowledge of his condition. It is therefore misleading to discuss the limitations on the power of a soliciting agent of a life insurance company to waive the conditions of a policy, for no agent of a life insurance company, however highly placed, has power to waive the good health condition in a policy by entering into a collusive arrangement with the insured. Globe Reserve Mutual Life Ins. Co. v. Duffy, 76 Md. 293, 300, 25 A. 227; Stiegler v. Eureka Life Ins. Co., 146 Md. 629, 637, 638, 127 A. 397; Eureka-Maryland Assurance Corp. v. Scalco, 158 Md. 73, 148 A. 267; Aetna Life Ins. Co. v. Routon, 207 Ark. 132, 133, 179 S.W.2d 862; Gardner v. North State Mut. Life Ins. Co., 163 N.C. 367, 378, 79 S.E. 806, 48 L.R.A.,N.S., 714.

7. It is not claimed that Souter knew at any time that he was suffering from this disease, but it is certain that he knew at the time of the delivery of the policy that he was not in sound health, since he was then a patient in the hospital and had just undergone a major operation.

8. "It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. * * * Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." 321 U.S. 29, at page 35, 64 S.Ct. 409, at page 412.

9. The question of fraud has not been raised by the parties and was not considered by the District Court. Under these circumstances, we think it sufficient to dispose of the case upon the issues framed.