Vera CHAWLA, Trustee for Harald Giesinger Special Trust, Plaintiff–Appellant,

v.

TRANSAMERICA OCCIDENTAL LIFE INSURANCE COMPANY, Defendant–Appellee.

League of Life and Health Insurers of Maryland; Massachusetts Mutual Life Insurance Company; Banner Life Insurance Company, Amici Supporting Appellee.

No. 05–1160.

United States Court of Appeals, Fourth Circuit.

Argued: Jan. 31, 2006.

Decided: March 7, 2006.

**ARGUED:** William H. Crispin, Crispin & Associates, P.L.L.C., Washington, D.C., for Appellant. E. Ford Stephens, Christian & Barton, L.L.P., Richmond, Virginia, for Appellee. **ON BRIEF:** Lauren A. Greenberg, Crispin & Associates, P.L.L.C., Washington, D.C., for Appellant. James E. Moore, Christian & Barton, L.L.P., Richmond, Virginia, for Appellee. Bryan D. Bolton, Cheryl A.C. Brown, Funk & Bolton, P.A., Baltimore, Maryland, for Amici Curiae Supporting Appellee.

Before WILKINSON and KING, Circuit Judges, and RICHARD D. BENNETT, United States District Judge for the District of Maryland, sitting by designation.

Affirmed in part and vacated in part by published opinion. Judge KING wrote the opinion, in which Judge WILKINSON and Judge BENNETT joined.

## OPINION

KING, Circuit Judge:

Vera Chawla, as trustee for the Harald Giesinger Special Trust, appeals from an award of summary judgment made to Transamerica Occidental Life Insurance Company on the Trust's claim of breach of an insurance contract.[1] By her civil action on behalf of the Trust in the Eastern District of Virginia, Chawla asserted that Transamerica had unlawfully rescinded an insurance policy issued on Harald Giesinger's life that was owned by and payable to the Trust (the "Policy"). In response, Transamerica contended that its rescission of the Policy was appropriate because: (1) material misrepresentations had been made in the life insurance applications; and (2) the Trust lacked any insurable interest in Giesinger's life. The district court ruled in favor of Transamerica on each of its contentions. As explained below, we affirm the court's summary judgment award on the basis of misrepresentations in the life insurance applications. We then vacate as unnecessary the court's alternative ruling that the Trust lacked an insurable interest in Giesinger's life.

### I.

#### A.

Giesinger and Chawla met sometime in the 1980s in connection with a real estate sale.[2] They quickly became close friends and remained so until Giesinger's death in 2001. Over the period of their friendship, Giesinger and Chawla engaged in several joint real-estate ventures, and Giesinger intermittently lived at the home of Chawla and her husband, Dr. Indra Chawla, a medical doctor.

Giesinger was seventy-two years old in May 2000 when the initial life insurance application for the Policy was completed. Put mildly, Giesinger was not then in perfect health. For many years, he had been drinking heavily and, sometime in the 1990s, he had developed a meningioma, i.e., a "hard, slow growing usually vascular tumor . . . invading the dura and skull and leading to erosion and thinning of the skull." J.A. 848.[3] According to Chawla

---

1. We refer to the Harald Giesinger Special Trust as the "Trust," and to trustee Vera Chawla as "Chawla."

2. Because this appeal is from an award of summary judgment to Transamerica, we present the facts in the light most favorable to Chawla. *See EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir.2005).

3. Citations to "J.A. ——" refer to the contents of the Joint Appendix filed by the parties in this appeal.

and her husband, Giesinger began suffering memory lapses in the late 1990s, often forgetting events shortly after they occurred. These memory problems worsened as time went on.

Giesinger normally spent half of each year in Austria. His attending physicians there had been watching his meningioma grow for years, but they had abstained from operating due to the risks inherent in brain surgery. In October 1999, however, because his brain tumor began to "develop characteristics of a disorder," causing homonymous hemianopsia (restricted field of vision) and speech defects, the Austrian physicians surgically removed a portion of it. Although the brain surgery was largely successful, the physicians, in November 1999, performed "serial taps" to drain a "subgaleal collection of cerebrospinal fluid" that had collected in Giesinger's brain following surgery. J.A. 691. The Austrian physicians' records from that period also indicate a diagnosis of "chronic alcohol abuse," and note "[m]oderate elevation of the liver transminases" most likely caused by "alcohol poisoning in conjunction with known chronic alcohol abuse." J.A. 706–07.

In late 1999, Giesinger returned to the United States. He continued to experience problems with cerebrospinal fluid collecting in his brain and, on December 29, 1999, physicians at George Washington University Hospital ("GWU Hospital") performed surgery on Giesinger to insert a lumbo-peritoneal shunt in an attempt to drain the excess fluid. The surgery required a four-to-five-inch incision in Giesinger's abdomen. On January 4, 2000, Giesinger was again admitted to GWU Hospital after being found "down at home." J.A. 801. Upon arriving at the hospital, he appeared disoriented and was unable to explain what had happened to him. The GWU physicians attributed his condition to the consumption of various

pain medications, such as Oxycontin and oxycodone, but also found that he had "a history of alcohol overuse, which may have contributed to his change in mental status." *Id.* He was released from GWU Hospital on January 9, 2000, with instructions not to drink alcohol.

On February 1, 2000, Giesinger was once again admitted to GWU Hospital after being "found in his home lying on the floor with bowel incontinence." J.A. 783. He was principally diagnosed with "alcohol abuse unspecified use." J.A. 769. Giesinger admitted to "significant [alcohol] use and its causative effect on his mental status," J.A. 784, and advised the physicians that he regularly drank a glass of wine as an "eye-opener." J.A. 790. Upon discharge from GWU Hospital on February 5, 2000, he was instructed to avoid alcohol and was given the phone number for Alcoholics Anonymous.

On February 18, 2000, Chawla accompanied Giesinger to an appointment for a physical examination with Dr. Daniel V. Young, a general practitioner. Giesinger advised Dr. Young of his meningioma surgery in Austria, his hospitalizations at GWU Hospital, and his daily drinking habits. Chawla also accompanied Giesinger to an appointment on April 17, 2000, with a urologist, Dr. Henry Wise. Because Giesinger's prostate was enlarged, Wise performed a biopsy, which tested negative for cancer. During this appointment, Giesinger advised Dr. Wise of his meningioma and shunt surgeries.

On May 4, 2000, Chawla applied with Transamerica for the Policy, with coverage in the sum of $1 million, on Giesinger's life. Chawla was to own and be the sole beneficiary of the Policy. The life insurance application consisted of two parts: Part 1 requested general information about the insured, and Part 2 related to his medical history. In order to complete Part 2 of

the application, Giesinger and Chawla met with Melissa Hadinger, a paramedic for Transamerica. Hadinger asked Giesinger the medical history questions from Part 2 of the application and marked his answers on the form. As relevant here, Giesinger answered "no" to the following questions:

6.c. Within the past five years have you had observation or treatment at a clinic, hospital or sanatarium?

6.d. Within the past five years have you had or been advised to have a surgical operation?

9.c. Have you ever received treatment or joined an organization for alcoholism or drug addiction?

According to Chawla, when Hadinger asked Giesinger if he had undergone surgery in the preceding five years, he advised her that a meningioma had been removed from his head. When Hadinger asked what a meningioma was, Giesinger responded that it was a benign cyst. When asked whether he had been examined or treated by any physician in the preceding five years, Giesinger responded affirmatively but disclosed only that he had received a physical examination in February 2000 from Dr. Young and a prostate biopsy in April 2000 from Dr. Wise.

After meeting with Hadinger, Giesinger was examined, in connection with the life insurance application, by Dr. Warren Parmelee. In examining Giesinger, Parmelee noticed a four-to-five-inch surgical scar on Giesinger's abdomen, and he inquired whether Giesinger had undergone a chloecystectomy (gall bladder removal). Giesinger responded "no" and advised Parmelee that he had no recollection of where the scar came from. Dr. Parmelee later testified that, "normally," when a patient denied such knowledge, he would suspect the patient of lying. J.A. 379–80. He also testified, however, that he did not recall Giesinger "in any way," and had no recollection of his impression of Giesinger's

honesty. J.A. 1197. Dr. Jack Shalley, a Transamerica vice-president, conceded that, based on Parmelee's report, "[w]ith perfect 20/20 hindsight we probably should have inquired more fully," but observed that "it is still an underwriting decision whether or not to pursue that." J.A. 1233.

In further support of the life insurance application, which was signed by both Chawla and Giesinger, Chawla submitted to Transamerica a letter dated June 1, 2000, from her husband, Dr. Chawla, attesting that Giesinger "ha[d] no history of any disease that I know of and otherwise [was] in good health," J.A. 1288, and relating the results of Giesinger's recent prostate biopsy. Dr. Chawla later testified by deposition that he had never examined Giesinger at his office, having only seen Giesinger at his home.

Neither Giesinger nor Chawla ever disclosed to Transamerica Giesinger's shunt surgery, his two hospitalizations at GWU Hospital in January and February 2000, or the nature of Giesinger's meningioma surgery. Transamerica, however, had previously issued three insurance policies on Giesinger's life, one in September 1994, one in August 1995, and one in September 1999. And, in applying for at least one of those policies, Giesinger had disclosed that he suffered from a meningioma, which was documented in Transamerica's files. Transamerica's file on one of the earlier policies also contained a scribbled, handwritten report, reflecting that Giesinger consumed a bottle of wine daily.

### B.

Transamerica rejected the initial life insurance application because it concluded that Chawla, the intended beneficiary, lacked an insurable interest in Giesinger's life. Shortly thereafter, a revised Part 1 of the life insurance application was submitted to Transamerica, naming the Trust

as the proposed owner and beneficiary of the Policy. Under the trust agreement, which had been executed in June 1995, Giesinger and Chawla were named as joint trustees. The Trust was irrevocable and its res consisted of Giesinger's Washington, D.C. residence. The trust agreement provided that, during Giesinger's life, he retained the right to receive all income from the Trust and the right to occupy the D.C. residence. At his death the trust property was to be distributed solely to Chawla, personally. With the Trust being named as both owner and beneficiary of the Policy, Transamerica, on July 20, 2000, approved the revised life insurance application and delivered the Policy, with coverage in the sum of $1 million, to Chawla at her home in Maryland.

Soon thereafter, in July 2000, Giesinger returned to Austria. On August 14, 2000, he was hospitalized there because of bouts of unconsciousness that his treating physicians believed to be associated with his meningioma and with alcohol abuse. Giesinger was not released from this hospitalization until September 6, 2000. On September 14, 2000, the Trust sought to have Transamerica increase the Policy's coverage to $2.45 million. Another life insurance application was then completed and submitted to Transamerica, but no additional information concerning Giesinger's surgeries, hospitalizations, or medical history was included. On September 28, 2000, Transamerica approved the new application and issued an endorsement upgrading the Policy's coverage on Giesinger's life to $2.45 million.

Giesinger died of heart failure nearly a year later, on September 23, 2001. On October 17, 2001, Chawla, acting on behalf of the Trust, filed a claim for the Policy's benefits with Transamerica. *Id.* On July 9, 2002, after conducting an extensive investigation, Transamerica rescinded the Policy on the ground that Giesinger had failed to make full disclosure to it in completing Part 2 of the applications. Transamerica also refunded to the Trust the premiums that had been paid on the Policy, in the sum of more than $47,000.

On September 24, 2003, Chawla, as trustee, filed suit in the Eastern District of Virginia against Transamerica, alleging that it had unlawfully rescinded the Policy. In its answer, Transamerica asserted that its rescission of the Policy was justified because material misrepresentations had been made in connection with the life insurance applications, and because the Trust lacked any insurable interest in Giesinger's life. Transamerica also asserted a counterclaim against the Trust for fraud. After over a year of discovery proceedings, the parties cross-moved for summary judgment. By its opinion of February 3, 2005, the district court denied summary judgment to Chawla, granted summary judgment to Transamerica, and ruled that Transamerica's counterclaim had been rendered moot. *Chawla v. Transamerica Occidental Life Ins. Co.,* No. 03–CV–1215, slip op. at 17, 2005 WL 405405, at *—— (E.D.Va. Feb. 3, 2005).

Chawla has timely appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo an award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *See EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir.2005). An award of summary judgment "is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.' " *Id.* (quot-

ing Fed.R.Civ.P. 56(c)) (alteration in original).

### III.

In this appeal, Chawla makes two contentions: (1) that the district court erred in concluding that material misrepresentations made on the life insurance applications entitled Transamerica to rescind the Policy; and (2) that the court erred in ruling that the Trust lacked any insurable interest in Giesinger's life. We address these contentions in turn.

### A.

On the misrepresentation issue, it is significant that Chawla does not contend that Giesinger's meningioma surgery, his shunt surgery, his two hospitalizations at GWU Hospital, or his subsequent hospitalization in Austria, were immaterial to the risk assumed by Transamerica in its issuance of the Policy. Nor does she deny that Giesinger should have disclosed these facts in response to the questions on Part 2 of the life insurance applications. Rather, Chawla contends that Transamerica is not entitled to rely on the defense of misrepresentation because of what it knew and what it reasonably should have known at the time the Policy and the $2.45 million endorsement was issued. Although somewhat unclear on the point, Chawla appears to advance two theories on why Transamerica is not entitled to the misrepresentation defense: first, Transamerica has waived any such defense, and second, Transamerica is estopped from asserting

it. Although the doctrines of waiver and estoppel are "interrelated," *Travelers Indem. Co. v. Nationwide Constr. Corp.*, 244 Md. 401, 224 A.2d 285, 292 (1966) (internal quotation marks omitted), they are distinct concepts under Maryland law. We separately assess the asserted applicability of these concepts.[4]

### 1.

■■■■ Maryland law recognizes a waiver as "the voluntary and intentional relinquishment of a known right." *Progressive Cas. Ins. Co. v. Ehrhardt*, 69 Md.App. 431, 518 A.2d 151, 157 (Md.Ct.Spec.App.1986) (citations omitted). Because a waiver must be intentional, a party cannot waive a misrepresentation unless it has actual knowledge that the misrepresentation is false. *See Traveler's Indem. Co.*, 224 A.2d at 291–92 ("There is no waiver ... unless a known right is clearly and intentionally renounced.") (citations omitted). Thus, in assessing whether Transamerica has waived its misrepresentation defense, we look only to the facts known to Transamerica when it issued the Policy.

■■■ Viewing the facts in the light most favorable to Chawla, Transamerica had actual knowledge that Giesinger suffered from a meningioma and drank a bottle of wine daily. Giesinger had disclosed these facts in connection with one or more of the earlier life insurance policies he obtained from Transamerica, and Transamerica's files on those policies contained his disclosures.[5] Transamerica was also aware, through Dr. Parmelee's examination, that

---

4. In its opinion awarding summary judgment to Transamerica, the district court concluded that Maryland law applies to this dispute. Neither party challenges that conclusion on appeal.

5. Transamerica contends that, at the time it was underwriting the Policy, it was not aware of the records contained in its earlier files. Appellee's Br. at 5. It asserted during discov-

ery that the earlier files were not discovered during underwriting because the birthdate Giesinger provided in connection with those policies (March 9, 1928) was different from the birthdate he provided in connection with the Policy (March 29, 1928). J.A. 1043, 1047. In the posture of this appeal, however, we draw the inferences in favor of Chawla and infer that Transamerica knew the contents of its files on the earlier policies.

Giesinger had an unexplained four-to-five-inch surgical scar on his abdomen. Although Parmelee did not remember examining Giesinger, he explained that a four-month old surgical scar ordinarily would not be confused with a scar more than five years old. Drawing the inferences in favor of Chawla, we assume that Dr. Parmelee knew that Giesinger had undergone surgery within the previous five years, which was inconsistent with the answer he provided on Question 6.d of Part 2 of the life insurance application. Dr. Parmelee did not know, however, that the scar had resulted from Giesinger's shunt surgery. Rather, his testimony suggests that he believed the scar to be from a chloecystectomy.

Chawla maintains that Transamerica was also aware that Giesinger had undergone meningioma surgery because, according to her testimony, Giesinger had disclosed the surgery to Hadinger, Transamerica's paramedic. But Chawla also testified that Hadinger was not familiar with the term "meningioma" and that, when she asked Giesinger what a meningioma was, he described it as a "benign cyst." J.A. 123. Thus, even if Hadinger's knowledge of a benign cyst is imputed to Transamerica, she lacked knowledge of the actual nature of Giesinger's brain surgery. On these facts, we cannot assume that Transamerica was aware of the meningioma surgery when it issued the Policy.

Transamerica's actual knowledge was therefore limited to the following facts: that Giesinger had a meningioma, that he had undergone surgery that involved cutting into his abdomen, and that he drank a bottle of wine daily. Of the facts Giesinger was obliged to disclose, these are among the most insignificant. Transamerica was not aware of the meningioma surgery, the shunt surgery, or Giesinger's three hospitalizations. Moreover, because Transamerica was unaware of these events, it did not possess the records made in connection with them, several of which suggested that Giesinger's drinking problems exceeded the consumption of a bottle of wine per day. Because Transamerica lacked awareness of material facts concealed by Giesinger's misrepresentations, it could not and did not waive the defense of misrepresentation.

### 2.

■ Chawla also asserts on appeal that, in these circumstances, Transamerica is estopped from asserting the defense of misrepresentation. In support of this assertion, Chawla maintains that the facts known to Transamerica when it issued the Policy triggered a duty on its part to investigate further into Giesinger's health beforehand. In response, Transamerica contends that the circumstances surrounding the life insurance applications were insufficiently suspicious to trigger any duty to investigate. It further asserts that, even if it had a duty to investigate, Chawla is not entitled to the benefit of estoppel because she and Giesinger did not detrimentally rely on Transamerica's issuance of the Policy, and because she and Giesinger did not act in good faith in acquiring the Policy.

■ Under Maryland law, "[e]quitable estoppel is comprised of three basic elements: (1) a voluntary misrepresentation of one party, (2) that is relied on by the other party, (3) to the other party's detriment." *Reichs Ford Road Joint Venture v. State Roads Comm'n of the State Highway Admin.*, 388 Md. 500, 880 A.2d 307, 321 (2005) (citation omitted). The party asserting estoppel "bears the burden of adducing facts to support its contention." *Id.* Although "[w]rongful or unconscionable conduct is generally an element of estoppel, ... an estoppel may arise even when there is no intent to mislead, if the actions of one party cause a prejudicial

change in the conduct of the other." *Creveling v. Gov't Employees Ins. Co.*, 376 Md. 72, 828 A.2d 229, 247 (2003) (internal citations omitted); *see also Travelers Indem. Co.*, 224 A.2d at 293 ("[I]t is the effect of the conduct of a party, apart from its morality, upon the position of the other party, which is the basis of equitable estoppel.").

Chawla's primary contention on the estoppel issue is that the information known to Transamerica at the time it issued the Policy triggered a duty on its part to investigate Giesinger's health. Chawla maintains that, had Transamerica complied with this duty (and, for example, obtained Giesinger's medical records from Drs. Young and Wise), it would have discovered the surgeries and hospitalizations that Giesinger failed to disclose in connection with the life insurance applications. In substance, Chawla asserts that, in failing to fulfill its duty to investigate Giesinger's health, Transamerica represented to her and to Giesinger that it would not rescind the Policy on account of the misrepresentations made in the applications.

■ As a general matter, Maryland law does not impose on insurers a duty to investigate insurance applicants. *See N. Am. Specialty Ins. Co. v. Savage*, 977 F.Supp. 725, 731 (D.Md.1997) ("Generally, insurers do not have a duty to investigate insurance applicants and are entitled to believe what an applicant claims to be true."). In " 'extraordinary situations,' " however, when an insurer is presented with " 'a considerable amount of suspicious information,' " it is under a duty to investigate before issuing an insurance policy. *Id.* (quoting *Clemons v. Am. Cas. Co.*, 841

F.Supp. 160, 167 (D.Md.1993)). The circumstances surrounding the life insurance applications in this case certainly provided Transamerica with a basis for being suspicious. In addition to its files on the three earlier policies—indicating that Giesinger, a seventy-two-year-old man, had a slow-growing tumor on his brain, and drank a bottle of wine every day—Transamerica's examining physician, Dr. Parmelee, noticed a fresh, four-to-five-inch surgical scar on Giesinger's abdomen that Giesinger could not explain. We are unable, in view of these facts, to say that such circumstances should not have raised the eyebrows of a prudent insurer.

We need not actually decide, however, in resolving this appeal, whether the pertinent circumstances of this matter constituted an "extraordinary situation" triggering a duty to investigate on the part of Transamerica. In order to claim the benefit of estoppel, a party must demonstrate that it changed its position for the worse in reliance on the other party's representation. *See Allstate Ins. Co. v. Reliance Ins. Co.*, 141 Md.App. 506, 786 A.2d 27, 32 (2001) ("In order for estoppel to apply, one must have been misled and sustained injury."). We have recognized that, where an insured seeks to estop an insurer from rescinding an insurance policy, he is obliged to show that he could have obtained insurance elsewhere, in order to satisfy the essential element of detrimental reliance. *See Souter v. State Mut. Life Assurance Co.*, 273 F.2d 921, 926 (4th Cir. 1960) (applying Maryland law to conclude that insured failed to demonstrate detriment because he could not show that he could have obtained coverage from another insurer).[6] Chawla has offered no proof

**6.** Relying on an unpublished decision of the District of Maryland, Chawla asserts that defeating a person's expectation that he is insured is sufficient detriment for a claim of estoppel. *See* Reply Br. at 10 (citing *Valley Forge Life Ins. Co. v. Liebowitz*, No. Civ. A.

DKC 2003–1809, 2005 WL 600330, at * 6 (D.Md. March 15, 2005)). The mere fact that a person mistakenly believes he has insurance coverage, however, is insufficient to demonstrate detriment, especially where, as here,

that any other insurer, properly apprised of Giesinger's true physical condition, would have issued a policy on his life. She has therefore failed to carry her burden of establishing the elements of estoppel.[7]

### B.

In addition to ruling that Transamerica was entitled to prevail on its misrepresentation defense, the district court ruled, in the alternative, that the Trust lacked any insurable interest in Giesinger's life. The court's reasoning on this point is susceptible to being interpreted as concluding that, under Maryland law, a trust can never possess an insurable interest in a person's life. And, as the *amici curiae* emphasize, such a ruling could "significantly impact Maryland law and how life insurance companies transact business in Maryland." Br. for the League of Life and Health Insurers of Maryland et al. as Amici Curiae Supporting Appellee at 2.

Because the district court correctly awarded summary judgment to Transamerica on the misrepresentation issue, its alternative ruling appears to have unnecessarily addressed an important and novel question of Maryland law. And, as a general proposition, courts should avoid deciding more than is necessary to resolve a specific case. This important aspect of the doctrine of judicial restraint has particular application when a federal court is seemingly faced with a state-law issue of first impression. *Cf. Kaiser Steel Corp. v. W.S. Ranch Co.*, 391 U.S. 593, 594, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968) (observing that, in certain circumstances, federal courts should abstain from ruling on "novel" state-law issue of "vital concern"). In these circumstances, we vacate as unnecessary the district court's alternative ruling

that the Trust lacked any insurable interest in Giesinger's life. *See Chawla v. Transamerica Occidental Life Ins. Co.*, No. 03–CV–1215, slip op. at 13–16, 2005 WL 405405, at *—— (E.D.Va. Feb. 3, 2005)

### IV.

Pursuant to the foregoing, Transamerica was entitled to rescind the Policy because of misrepresentations in the life insurance applications, and we accordingly affirm the judgment of the district court. We vacate its alternative ruling as unnecessary.

*AFFIRMED IN PART AND VACATED IN PART*

---

the insurer has refunded all premiums that were paid. *See Souter,* 273 F.2d at 926.

7. Because we conclude that Ms. Chawla suffered no detriment, we need not reach Transamerica's alternative contention that Giesinger and Chawla acted in bad faith.